UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE: GRAND JURY PROCEEDINGS )
)
(M/V/ MSC ELENA) )
) **FILED UNDER SEAL**
)
_____ )

### APPLICATION FOR MATERIAL WITNESS ARREST WARRANTS

The United States of America respectfully requests that the Court issue warrants under Title 18, United States Code, Section 3144 for the arrest of the following persons as material witnesses in the Grand Jury investigation of Mediterranean Shipping Company, the operator of the M/V MSC Elena:

| Name | Rank | Nationality | Birth Date | Passport or Seaman's Passport No. |
|---|---|---|---|---|
| Maurice Correia | Motorman | Indian | 11/17/1968 | A2877062 |
| Joe Cherian | Wiper | Indian | 10/04/1979 | A9799308 |
| Jagdish Chand | Third Engineer | Indian | 10/25/1963 | A1081043 |
| Raj Rajesh Fernado | Motorman | Indian | 02/10/1969 | A4001683 |
| Aman R. Mahana | Second Engineer | Indian | 03/08/1976 | E3839434 |
| Ranjish Mukulam | Fourth Engineer | Indian | 05/03/1975 | B0053778 |
| Mani Singh | Chief Engineer | Indian | 06/10/1948 | E4397396 |
| Menom M. Sivadas | Master | Indian | 07/31/1953 | F3368599 |
| Ankur Srivastav | Junior Engineer | Indian | 02/24/1982 | E8349845 |

As set forth in the accompanying affidavit, the Government has probable cause to believe that these individuals, who are crew members of the M/V MSC Elena, are necessary and material witnesses in the above investigation. The Government also has cause to believe that the normal

May 19, 2005. Allowed.

Marianne B. Bowler, USMJ

subpoena process cannot secure the appearances of these witnesses. Each of these witnesses is a foreign citizen who has no known status in the United States and who will not be subject to compulsory process if he is allowed to return to his native country, or to leave the jurisdiction of the United States in the vessel upon which he arrived.

The United States requests that the Court set appropriate conditions for their release within the District of Massachusetts, consistent with any conditions imposed by the Immigration and Naturalization Service, until such time as the United States has expeditiously obtained their testimony. The United States today will subpoena these witnesses to appear before the Grand Jury beginning on May 26, 2005. The United States will proceed in good faith and with due diligence to complete the witnesses' testimony in the next three weeks. Delays may, however, occur if, for instance, the subpoenaed witnesses refuse in part or in full to testify, or if they give materially false testimony. The witnesses' obligations to remain in the District pending the completion of their testimony can be addressed with the Court at a future date.

If charges are filed, the United States may reapply to the Court to extend that date to allow for depositions pursuant to Rule 15. The USCG and representatives of the owner and operator of the vessel are currently negotiating a surety bond and security agreement. The USCG is seeking that the owner and operator agree to make arrangements for the material witnesses to stay in the Boston area and to pay related expenses. Assuming that the owner and operator agree to such terms as deemed acceptable by the USCG, then the United States will not be seeking that any of these individuals be incarcerated during their stay in Boston.

This application is supported by the affidavit of United States Coast Guard Special Agent Michael Burnett, filed herewith.

                                            Respectfully submitted,

                                            Michael L. Sullivan
                                            United States Attorney

                                            *SAUSA S. WAQAR HASIB for:*
                                            Jonathan F. Mitchell
                                            Assistant United States Attorney

                                            Richard Udell
                                            Malinda Lawrence
                                            Trial Attorneys
                                            Environmental Crimes Section
                                            United States Department of Justice

## AFFIDAVIT

I, Michael Burnett, being first duly sworn, depose and say:

1. I am a Special Agent with the United States Coast Guard ("USCG"), Coast Guard Investigative Service (CGIS). I have been a Special Agent with CGIS since September 2004. I have been a criminal investigator for approximately six years. I have prior law enforcement experience as a Special Agent with the Diplomatic Security Service of the US Department of State and as a Reserve Special Agent with the Air Force Office of Special Investigations. I am currently assigned to investigate various violations of federal law within the jurisdiction of the United States Coast Guard (USCG).

2. As set forth in more detail below, this investigation concerns the M/V MSC ELENA, a foreign flag cargo container. In summary, my investigation shows that there is probable cause to believe that this vessel has made improper discharges of oil contaminated sludge waste and that these discharges were not recorded in the ship's Oil Record Book which was presented to the USCG on May 17, 2005 in Boston, Massachusetts. The Oil Record Book is a document required by U.S. law and international treaty and it appears that this record contains materially false and misleading entries and omissions regarding overboard discharges.

3. This affidavit is made in support of an application for material witness arrest warrants of nine crew members of the M/V MSC ELENA in connection with a Grand Jury investigation. For the reasons contained in this affidavit, I have probable cause to believe that the following nine persons have material evidence of violations of 18 U.S.C. §§ 371, 1001, 1505, 1519 and 2, and 33 U.S.C. § 1908 and 33 C.F.R. § 151.25(a) & (h), relevant to the Grand Jury's investigation. All but one of these witnesses worked in the engine room of the Elena, and all of them are India nationals:

(1)   Motorman ("M/M") Maurice CORREIA, Date of Birth: November 17, 1968, Seaman's passport number A-2877062;

(2)   Wiper Joe Cherian, Date of Birth: October 4, 1979, Seaman's passport number A-9799308;

(3)   Third Engineer ("3/E") Jagdish Chand, Date of Birth: October 25, 1963, Seaman's passport number A-1081043;

(4)   M/M Raj Rajesh FERNADO, Date of Birth: February 10, 1969, Seaman's passport number A-4001683;

(5)   Second Engineer ("2/E") Aman R MAHANA, Date of Birth: 8 March 1976, Seaman's passport number E-3839434;

(6)   Fourth Engineer ("4/E") Ranjish Mukulam, Date of Birth, May 3, 1975, Seaman's passport number B-0053778;

(7)   Chief Engineer Mani Singh, Date of Birth: Jun 10, 1948; Seaman's passport number E-4397396;

(8)   Master Menom M. Sivadas, Date of Birth: July 31, 1953, Seaman's passport number F-3368599; and

(9)   Junior Engineer Ankur Srivastav, Date of Birth: February 24, 1982, Seaman's passport E-8349845.

4.   The presence of these witnesses in the District of Massachusetts is required to assist with the Grand Jury's investigation into violations of the foregoing statutes on the M/V MSC ELENA by its owner and operator or others, and to protect the confrontation rights of any defendants to be charged by the government. Each of these material witnesses will be outside of the compulsory process of the United States if allowed to return to the India or to leave the

jurisdiction of the United States in the vessel upon which they arrived.

5. I am currently investigating allegations that Mediterranean Shipping Company ("MSC"), the operator of the M/V MSC ELENA, a Panamanian flagged vessel, and engineers aboard the ship, may have made materially false statements and used materially false writings in a matter within the jurisdiction of the USCG, and committed other violations of federal criminal law. As set forth below, the M/V MSC ELENA arrived in Boston, Massachusetts, on or about Monday, May 16, 2005, and is currently being detained by the USCG pursuant to an order by the Captain of the Port. The ship is anticipated to depart as early as May 20, 2005 after satisfying USCG requirements.

6. I make this affidavit based upon personal knowledge as well as information obtained from other investigators, USCG Inspectors that examined the ship and spoke with crew members, and from my review of documents. Because this affidavit is being submitted for a limited purpose, I have not set forth each and every fact known to me. I have personally reviewed evidence from the M/V MSC ELENA, interviewed several crew members and spoken with USCG Inspectors as part of this investigation.

## LEGAL FRAMEWORK

7. The Court has the authority under 18 U.S.C. § 3144 to detain an individual as a material witness in any criminal proceeding. Title 18, United States Code, Section 3144, provides that:

> If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of Section 3142 of this title.

18 U.S.C. § 3144. Before a material witness arrest warrant may issue, the Court must have probable cause to believe (1) the testimony of the person is material and (2) it may become impracticable to secure his presence by subpoena. Bacon v. United States, 449 F.2d 933, 943 (9th Cir. 1971).

8.      Pursuant to Title 18, United States Code, Section 1001, it is a crime to knowingly and willfully falsify, conceal and cover up by trick, scheme and device a material fact, to make materially false statements and representations, and to make and use materially false writings and documents, in a matter within the jurisdiction of an agency of the United States. The U.S. Coast Guard is an agency of the United States.

9.      The Act to Prevent Pollution from Ships (APPS), makes it a crime to knowingly violate the "MARPOL 73/78", an international treaty to which the United States is a party, or a series of similar regulations promulgated pursuant to APPS. 33 U.S.C. § 1908(a). The 1973 International Convention for the Prevention of Pollution From Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution From Ships, 1973, are commonly referred to as "MARPOL 73/78." This treaty established the international standard that discharges of bilge waste from machinery spaces must contain less than 15 parts per million (ppm) oil. MARPOL prohibits discharges from oil contaminated bilge waste unless the ship has in operation approved oil water separating equipment. MARPOL also requires an oil sensing device, such as that which would be found on an Oil Water Separator, to prevent the discharge of a mixture containing more than 15 ppm of oil. Typically, when a sensor on an Oil Water Separator detects more than the allowable parts per million of oil, it redirects that effluent to a storage tank on board a ship through the use of a 3-way valve. On a ship, leaks from assorted pieces of machinery, such as diesel engines ("oil") and cooling systems ("water"), generate a

constant stream of liquid waste in the normal course of operating the vessel. This liquid waste collects in the bottom ("bilges") of the ship. The bilges must be regularly emptied in order to ensure the safety of the ship (e.g., prevent stability problems and the flooding of the engine room).

10. In order for a ship's bildges to properly be emptied at sea, bilge waste must be filtered through an Oily Water Separator ("OWS"), designed to make sure any waste pumped overboard contains less than 15 ppm oil to water. However, the OWS requires regular maintenance and equipment changes (e.g., filters) as well as a crewmember to monitor its operation. In addition, the OWS is frequently too small to adequately handle the waste generated from the bilges and can become fouled, rendering it inoperable. In order to save time and money, crewmembers can bypass the OWS and pump directly overboard.

11. A bypass can be accomplished in many ways. In its simplest form, one end of a hose is connected to the bilge pipe, which directs waste from the bilges to the OWS, on the intake side of the OWS and the other end is connected to the overboard discharge valve on the skin of the ship. The bilge pump is then activated and the waste travels through the hose, bypassing the OWS, and goes directly overboard.

12. Under APPS regulations, each oil tanker of 150 gross tons or more or non-tanker vessel of more than 400 gross tons must maintain a record known as an Oil Record Book. 33 C.F.R. § 151.25.(a). Entries must be made in the Oil Record Book for certain engine room operations, including the disposal of oil residue or the discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces. 33 C.F.R. § 151.25(d). All accidental, emergency or other exceptional discharges of bilge waste or oil must be recorded in the ORB along with the reason for the discharge. 33 C.F.R. § 151.25(g). Each of these engine room

operations, including the overboard discharge of bilge waste, is required to be fully recorded without delay in the Oil Record Book. 33 C.F.R. § 151.25(h). The entries are to be signed by the person or persons in charge of the operation and each completed page must be signed by the Captain of the ship. 33 C.F.R. § 151.25(h). These regulations apply to foreign-flagged ships when they are in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States. 33 C.F.R. § 151.09. It is widely known within the maritime industry that the U.S. Coast Guard regularly inspects the Oil Record Book during port state inspections to determine compliance with U.S. law and the MARPOL Protocol and to assure that ships are not an environmental threat to U.S. ports and waters.

13. The U.S. Coast Guard is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. Section 89(a) to board ships and conduct regular inspections and investigations of potential violations. Under 14 U.S.C. Section 89(a), U.S. Coast Guard personnel may:

> make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

14. It is common knowledge within the maritime industry that the USCG conducts inspections to determine compliance with U.S. law, including environmental law. During a Port State Control and MARPOL inspection on May 16, 2005, the USCG, District One, Sector Boston conducted an examination of the Oil Record Book, for the M/V MSC ELENA in Boston,

Massachusetts.

15. The United States is part of an international regime governing vessel operation and safety, embodied in numerous agreements, ratified by the United States that depends on the principle of reciprocity. Flag states certify a ship's compliance with international standards, and port states, such as the United States, conduct inspections to assure compliance in their ports and waters. In conducting Port State Control inspections, the United States Coast Guard looks at, among other things, compliance with the International Convention for the Safety of Life at Sea (SOLAS), the MARPOL Protocol, and International Management Code for the Safe Operation of Ships and for Pollution Prevention (ISM Code). Failure to comply with domestic or international standards can form the basis of an order to refuse to allow a ship to enter port, to prohibit the ship from leaving port without remedial action, or to refer the matter to the flag state. In conducting these agency proceedings, United States Coast Guard personnel rely upon the statements of the ship's crew and documents, including the Oil Record Book.

**Facts Supporting Materiality of Testimony**

16. In summary, there is probable cause to believe that these witnesses possess information material to the grand jury investigation described herein. Upon inspection, the USCG discovered evidence that untreated oily sludge had been removed from the vessel and discharged directly into the ocean. During the inspection, three of the witnesses for whom warrants are sought, admitted to and even demonstrated the operation of a pump system that removed oily sludge from the sludge tank and discharged it into the ocean via an overboard discharge valve. These discharges of sludge were not recorded in the Oil Record Book, thus the Oil Record Book, which is required under MARPOL to left open to inspection by the Coast Guard, presents a false and misleading picture of the use and operation of required pollution

prevention equipment and the vessel's compliance with the law. As set forth below, I have obtained specific evidence, including an admission from the Second Engineer who was charged with operation of the Oil Water Separator and making entries in the Oil Record Book that he had modified and destroyed portions of the tank sounding logbook as well as altering the Oil Record Book under the direction of the current Chief Engineer in order to conceal the improper discharges in violation of MARPOL 73/78. I also have probable cause to believe that it is impracticable to secure the witnesses presence by subpoena: the witnesses are foreign national crew members aboard a foreign flagged vessel that has temporarily docked in Boston harbor. The vessel may sail as early as May 20, 2005 there is no other legal mechanism to prevent the witnesses from leaving with the vessel, and they would be beyond the compulsion of the court to secure their testimony.

17.   On 16 May 2005, the M/V MSC ELENA arrived at the Connelly Cargo Terminal in Boston, Massachusetts to deliver and load cargo containers. I have reviewed USCG Vessel Critical Profile for the M/V MSC ELENA, which shows that it is 663 feet in length and has a gross tonnage of 30,971. It has an International Maritime Organization (IMO) number of 9061480 and call sign of HPAU. It is owned by the NAVIERA ELANA Company and operated, according to Notice of Arrival (a required document for all vessels visiting the United States), by the Mediterranean Shipping Company Ship Management (Hong Kong, Ltd.) ("MSC").

18.   A USCG team from the Boston Marine Safety Office ("MSO") boarded the M/V MSC ELENA and conducted a previously scheduled Port State Control inspection on 16 May 2005. As part of the inspection the USCG requested to review all of the ship's required documentation to include the Oil Record Book. The ship's Master dispatched the Chief Engineer who retrieved this and other records and provided them it to USCG inspectors for review in the

ship's office. My presence was requested by Lt Edward Munoz, the Senior Marine Investigating Officer on site. CGIS Special Agent Jamie Tracy and I responded to and boarded the M/V MSC ELENA at approximately 1400 hours on 16 May 2005.

19.     Upon arrival, Lt Munoz and Lt Greg Callaghan, the lead USCG Marine Inspector, advised me that they had found several pieces of material that may have been used to remove sludge and oily water directly from the vessel into the ocean.

20.     SA Tracy and I accompanied the USCG Inspection Team in order to observe their inspection. During the inspection Lt Munoz led me below deck and showed me two short pieces of pipe and several plastic hoses that were placed in a void space near the engine room. I was also shown a long piece of pipe located in an overhead pipe rack and a portable pump unit located in the Engineer's workshop. Lt Munoz explained that all of the pieces contained an oily residue and that there was no apparent legitimate application for the items. The USCG team then began a more detailed inspection of the engine room and Lt Munoz requested that Menon Sivadas, the M/V MSC ELENA'S Master, muster his engineering crew so the USCG team could question them. Nine members of the engineering crew were assembled and each member was individually showed each item and asked about its use. Both M/M Correia and M/M Fernando stated to the Inspection team that they had seen the pump and pipes in use near the Oily Water Separator unit while the ship was underway. The remaining crewmembers stated that they did not know what the equipment was used for.

21.     Upon completion of the initial questioning, Lt Munoz, Lt Callaghan and I questioned four members of the crew concerning engine room procedures and the items discovered during the inspection. The first individual questioned was Motor Man Fernando. A motor man is a low-level crew member that assists the engineers with various tasks in the engine

room. Fernando told us that he had joined the ship on November 27, 2004 and that he usually works in the engine room during the daytime. When asked about the pipes and the pump unit, Fernando admitted that he had seen the device operating in the engine room near the oily water separator five to six days prior to the ship's arrival in Boston. Fernando stated that he could not lie and that he felt bad about the use of the pump to remove sludge from the ship.

22.     We then interviewed Motor Man Correia who informed us that he had joined the ship on 29 November 2004 in Italy. Correia stated that he also works in the engine room during the day and that he has seen the device in operation near the oily water separator at least four times since joining the crew.

23.     We then spoke with 2/E Mahana. Initially, Mahana denied any knowledge of the pump and pipe system. Mahana explained that the M/V MSC ELENA was recently acquired by MSC and that he had been one of the first members to join the crew in November of 2004. Mahana related that he had spent ten days on board working with the ship's previous crew before they departed. Mahana told us the engine room of the ship was in poor condition prior to his arrival and that the pump and pipe system had been used by the previous crew to pump sludge overboard.

24.     Mahana later changed his story; he stated that he was scared to talk to us out of fear for his safety and the safety of his wife who was on board the ship as a passenger. He believes that his employer would retaliate against him for cooperating with the USCG. Mahana informed the inspectors that he been instructed by the former Master and Chief Engineer to discharge overboard both sludge and oily water with the pump, pipes and hoses discovered by the USCG inspection team. Mahana had participated in this practice numerous times during his six-month tenure on board. He informed us that he had pumped sludge overboard seven days prior to

arriving in Boston, approximately seven-five miles off the coast of Portugal. When asked if the current Chief Engineer was aware of the practice he informed us that the current Chief instructed him to modify and destroy certain sections of the tank sounding log book and to alter the Oil Record Books in order to conceal the discharges. Mahana showed Lt Callahan in the tank sounding book where several of the pages had been torn out from the front of the book and where he had used pencil in order to adjust the reading to conceal the underway sludge discharges. When asked why the ship needed to dump sludge at sea instead of on shore, Mahana stated that the lube oil purifiers were not working correctly and they were producing a greater amount of sludge than could be stored on board. He also stated that the ship did not use its incinerator to dispose of sludge. The USCG Inspection team then asked Mahana to provide a brief sketch of how the illicit discharge system operated. Mahana explained how the pump and pipes could be utilized to remove either sludge or oily water via the overboard discharge valve. When asked if he knew this activity was wrong he admitted that both he and the former Chief Engineer knew it was bad but the former ship's Master had required them to engage in the discharging.

25.    Mani Singh, the M/V MSC ELENA'S Chief Engineer was then interviewed concerning the use of the items discovered in the engine room. Singh informed us that he had joined the crew two months prior and that he had never seen the equipment used in the engine room. When asked if he was aware of any illicit discharges of oily water or sludge from the engine room he stated that he was not.

26.    I have reviewed the Oil Record Book. It contains entries beginning on December 1, 2004 and ending May 16, 2005. There are entries indicating the proper use of the Oil Water Separator. There are no entries indicating that sludge was disposed of by incineration. There are entries indicating that sludge was offloaded in port on five occasions from December 2004 to

May 2005. Based upon interviews of the second engineer and the motor men, and the presence of oil in the bypass pipes before its operation was demonstrated by the crew, discharges overboard without the use of the Oil Water Separator occurred between December 1, 2004 and May 16, 2005. Upon review, I see no entries indicating these overboard discharges.

27. Based on interviews and crew positions, all eight engine room employees would have had an opportunity to observe the improper discharges. In addition to the chief engineer, the second engineer and the motor men, Third Engineer Jagdish CHAND, Fourth Engineer Ranjish MUKULAM, Junior Engineer Ankur SRIVASTAV and Wiper (an engine room assistant) Joe CHERIAN were interviewed. All denied knowledge. However, based on interviews and crew positions, all worked in the engine room and would have had an opportunity to observe the improper discharges. All of the Assistant Engineers, including Second, Third, Fourth and Junior Engineer work in the engine room operating the ship's machinery and performing routine maintenance. The Motormen and Wipers assist those engineers by performing tasks under the direction of the engineers, plus cleaning, painting and sounding tanks. The configuration of the illicit bypass piping, as described above, was such that it rested on the travel surface on the deck plating in the area of the oily water separator. When it was deployed, engineering staff would have to step over it in the normal course of their duties in that area. Retrieving the bypass pipe from its hiding places, assembling it, and affixing it to the appropriate flanges for operation are duties normally performed by the Motormen and Wipers, under direction of the Second Engineer.

28. The current Master of the ship, Menom Sividas, was also interviewed. He denied knowledge of improper discharges. He acknowledged that he signed each page of the Oil Record Book, as he is required under MARPOL.

29. Prior to seizing the pipes, hoses and pump, the USCG inspection teams asked M/M Fernando and Correia to assemble the equipment, as they normally did. Without further instruction, the motormen assembled the piping and pump unit around the oily water separator so that it was configured to allow sludge to be pumped directly from the sludge tank to the overboard discharge valve. The inspection team commented that the connections and pipe lengths had been professionally constructed to make an efficient and precise bypass. The team then requested that the motormen set the device up to pump oily water overboard. The motormen then utilized the plastic hoses to drop down into the oily water storage tank and configured the equipments to pump the oily water directly overboard via the same discharge valve. Upon completion of the demonstration, USCG Inspection team them drew oil samples from all parts of the device and the various connection valves for analysis. The Inspection team then departed the M/V MSC ELENA.

## CONCLUSION

30. Based on the above evidence, I have probable cause to believe that all those working in the engine room, including the following crew members, and the ship's Master, have material information regarding violations of United States law in the District of Massachusetts:

   (1) Motorman ("M/M") Maurice CORREIA, Date of Birth: November 17, 1968, Seaman's passport number A-2877062;

   (2) Wiper Joe Cherian, Date of Birth: October 4, 1979, Seaman's passport number A9799308;

   (3) Third Engineer ("3/E") Jagdish Chand, Date of Birth: October 25, 1963, Seaman's passport number A-1081043;

   (4) M/M Raj Rajesh FERNADO, Date of Birth: February 10, 1969, Seaman's

passport number A-4001683;

(5) Second Engineer ("2/E") Aman R MAHANA, Date of Birth: 8 March 1976, Seaman's passport number E-3839434;

(6) Fourth Engineer ("4/E") Ranjish Mukulam, Date of Birth, May 3, 1975, Seaman's passport number B-0053778;

(7) Chief Engineer Mani Singh, Date of Birth: Jun 10, 1948; Seaman's passport number E-4397396;

(8) Master Menom M. Sivadas, Date of Birth: July 31, 1953, Seaman's passport number F-3368599; and

(9) Junior Engineer Ankur Srivastav, Date of Birth: February 24, 1982, Seaman's passport E-8349845.

are required to assist with the Grand Jury's investigation and to protect the confrontation rights of any defendants to be charged by the government. Each of these material witnesses will be outside of the compulsory process of the United States if allowed to return to the India, or to depart with the vessel. The Government also has probable cause to believe that the normal subpoena process may not secure the appearances of these witnesses, since they are foreign

nationals, arriving by vessel, with no known immigration status or intention to stay in or ties with the United States, and would not be subject to compulsory process if allowed to leave the United States.

Dated: May 19, 2005

_____
Michael Burnett, Special Agent
United States Coast Guard

Sworn to before me this 17th day of May, 2005

_____
Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts